# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 22, 2015      Decided December 22, 2015

No. 15-5037

FOOD & WATER WATCH, INC., ET AL.,
APPELLANTS

v.

THOMAS J. VILSACK, IN HIS OFFICIAL CAPACITY AS THE U.S.
SECRETARY OF AGRICULTURE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01547)

*Zachary B. Corrigan* argued the cause and filed the briefs for appellants.

*Daniel Tenny*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Vincent H. Cohen Jr.*, Acting U.S. Attorney, and *Mark B. Stern*, Attorney. *Adam C. Jed*, Attorney, entered an appearance.

Before: HENDERSON, MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Opinion concurring in the judgment filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* MILLETT.

WILKINS, *Circuit Judge*:  Margaret Sowerwine and Jane Foran, individual consumers of poultry, and Food & Water Watch, Inc. ("FWW"), their organizational advocate, fear that new regulations promulgated by the United States Department of Agriculture ("USDA") may result in an increase in foodborne illness from contaminated poultry.  To prevent the regulations from going into effect, Plaintiffs sought declaratory and injunctive relief.  The District Court concluded that Plaintiffs failed to demonstrate an injury in fact and dismissed Plaintiffs' claims for lack of standing.

On appeal, Plaintiffs argue that the District Court applied an incorrect standard in finding that they lacked standing. According to Plaintiffs, once the appropriate standard is applied, their complaint and evidence show: (1) the Individual Plaintiffs, Margaret Sowerwine and Jane Foran, and FWW members have shown an increase in the risk of harm sufficient to establish an injury in fact; (2) FWW has shown an injury to its interest and expenditures made in response to that injury sufficient to establish an injury in fact; and (3) Plaintiffs have suffered a procedural injury sufficient to establish an injury in fact for purposes of standing.  Although the District Court applied the incorrect standard to evaluate Plaintiffs' standing, the District Court nonetheless correctly ruled that Plaintiffs have not alleged a sufficient injury to establish standing under the appropriate standard. Accordingly, we affirm.

**I.**

The Poultry Products Inspection Act ("PPIA"), 21 U.S.C. §§ 451-472, was born out of a Congressional interest in protecting consumer health and welfare by enabling the Secretary of Agriculture ("Secretary") to ensure that poultry products were "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451. The PPIA accomplishes this goal, in part, by requiring the Secretary to ensure that inspectors[1] conduct a post-mortem inspection of all poultry processed for human consumption. *Id.* § 455(b). The PPIA also requires condemnation and destruction for human food purposes of all poultry that is found to be adulterated, unless the poultry can be reprocessed under an inspector's supervision so that it is found to be not adulterated. *Id.* § 455(c). The PPIA defines "adulterated" to include various conditions, including containing, among other things, "any poisonous or deleterious substance which may render it injurious to health"; various additives that are unfit for human consumption; consisting in whole or in part of any "filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food"; or packaging in conditions where it "may have been rendered injurious to health." *Id.* § 453(g). Carcasses that pass inspection receive an official legend indicating that it was inspected by the USDA. *Id.* § 453(h)(12); 9 C.F.R. § 381.96.

---

[1] The PPIA defines an inspector as "(1) an employee or official of the United States Government authorized by the Secretary to inspect poultry and poultry products under the authority of this chapter, or (2) any employee or official of the government of any State or territory or the District of Columbia authorized by the Secretary to inspect poultry and poultry products under authority of this chapter." 21 U.S.C. § 453(k).

4

The Food Safety and Inspection Service ("FSIS") administers the PPIA. *See* 7 C.F.R. §§ 2.18(a)(1)(ii)(A), 2.53(a)(2)(i). Historically, FSIS has permitted chicken and turkey – the poultry products of concern to Plaintiffs – to be inspected under one of four inspection systems: the Streamlined Inspection System, the New Line Speed Inspection System, the New Turkey Inspection System, and traditional inspection (collectively, "the existing inspection systems"). Modernization of Poultry Slaughter Inspection, 77 Fed. Reg. 4408, 4410 (proposed Jan. 27, 2012). Under the existing inspection systems, FSIS inspectors perform either an online or offline role. *See id.* Offline inspectors ensure compliance with food safety regulations, verify sanitation procedures, and collect samples for pathogen testing. *See id.* One or more online FSIS inspectors inspect each poultry carcass with its viscera[2] immediately following the separation of the viscera from the carcass. *See id.* Under the existing inspection systems, the inspectors conduct an "organoleptic" inspection, using sight, touch, and smell to evaluate the carcasses. *See* Brief for Appellees, Food & Water Watch, Inc. v. Vilsack, No. 15-5037 (D.C. Cir.), Doc. No. 1553589, at 3; *see also* 77 Fed. Reg. at 4410 (noting that inspectors "examine each eviscerated carcass for visual defects"). Poultry establishment personnel do not conduct any sorting or evaluation of carcasses; the poultry establishments provide a "helper" who takes action only upon an FSIS inspector's direction. 77 Fed. Reg. at 4410.

---

[2] Viscera are "[t]he soft contents of the principal cavities of the body" which includes "the entrails or bowels together with the heart, liver, lungs, etc." OXFORD ENGLISH DICTIONARY (3d ed. 2007).

The inspection method at issue in this case, the New Poultry Inspection System ("NPIS"), alters the responsibilities of the FSIS inspectors and the establishment personnel. The NPIS rules institutionalize the shift from inspector-based sorting and evaluation to establishment-based sorting and evaluation. Under the NPIS, poultry establishment personnel sort the poultry carcasses and take corrective action prior to an FSIS inspection. *See id.* at 4421.

The NPIS grew out of FSIS's concern that agency resources were not being used in the most effective way to ensure food safety. *See id.* at 4410. In an effort to develop new methods to more effectively inspect poultry, in 1996 FSIS promulgated the "Pathogen Reduction/Hazard Analysis and Critical Control Points" ("HACCP") rule. *Id.* at 4413; Pathogen Reduction; Hazard Analysis and Critical Control Points, 61 Fed. Reg. 38806 (July 25, 1996). HACCP required poultry establishments to develop controls to ensure product safety and empowered the establishments to make their own determinations about how to meet the FSIS regulatory requirements. 77 Fed. Reg. at 4413. FSIS subsequently announced an HACCP-based inspection models project ("HIMP") that would allow FSIS to test and develop new inspection models. HACCP-Based Meat and Poultry Inspection Concepts, 62 Fed. Reg. 31553 (June 10, 1997). The pilot HIMP method made poultry establishment personnel "responsible for identifying and removing normal from abnormal carcasses and parts." 77 Fed. Reg. at 4413.

The HIMP pilot was challenged as a violation of the PPIA because FSIS inspectors did not inspect poultry carcasses themselves, leaving all inspection to establishment personnel with FSIS oversight. *Am. Fed'n of Gov't Empls., AFL-CIO v. Glickman* (*AFGE I*), 215 F.3d 7, 9-10 (D.C. Cir. 2000). This Court held that such delegation violated the

PPIA. *Id.* at 11. In response to *AFGE I*, "FSIS modified HIMP to position one inspector at a fixed location near the end of the slaughter line in each poultry slaughter establishment" who was responsible for evaluating each carcass after establishment personnel had sorted and processed it. 77 Fed. Reg. at 4413. The modified HIMP program was also challenged, and this Court held that the program did not violate the PPIA. *Am. Fed'n of Gov't Empls., AFL-CIO v. Veneman*, 284 F.3d 125, 130-31 (D.C. Cir. 2002). However, we cautioned that "[i]f the USDA undertakes a rulemaking to adopt as a permanent change something along the lines of the modified program, experience with the program's operation and its effectiveness will doubtless play a significant role" and warned that our opinion "may not necessarily foreshadow the outcome of judicial review of such future regulations." *Id.* at 130-31.

Twenty young chicken and five turkey establishments participated in HIMP, and FSIS collected and analyzed the data from these establishments. 77 Fed. Reg. at 4414. Using this data, FSIS concluded that the HIMP procedures "improved performance related to food safety and non-food-safety standards . . . especially in reducing pathogen levels" and proposed the NPIS to replace the existing inspection systems, excluding the traditional inspection system. *Id.* at 4421. Under the proposed NPIS rule, "establishments [would] be required to sort carcasses, to dispose of carcasses that must be condemned, and to conduct any necessary trimming or reprocessing activities before carcasses are presented to the online FSIS carcass inspector." *Id.* The carcasses would pass along a production line for the online inspector at a speed of 175 birds per minute for young chickens, and 55 birds per minute for turkeys. *Id.* at 4423. While establishment personnel sort carcasses, FSIS inspectors would reallocate their time by increasing offline inspection

activities. *Id.* at 4420, 4422. FSIS projected that 99.9% of young chickens and poultry would be produced under the NPIS. *Id.* at 4436. After a notice and comment period, FSIS adopted a final NPIS rule with a number of modifications, which included making adoption of the NPIS optional, and lowering the birds per minute speed of young chickens to 140 birds per minute. Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. 49566, 49570 (Aug. 21, 2014).

On September 11, 2014, Plaintiffs filed their complaint in this case, claiming that the NPIS constitutes "an unprecedented elimination of inspection resources for a secret set of young chicken and turkey slaughterhouses." Compl. ¶ 1, J.A. 9. In this spirit, Plaintiffs alleged eight claims against Defendants: (1) violation of 21 U.S.C. § 455(c) by allowing condemnation of young chicken and turkey carcasses by NPIS establishment personnel; (2) violation of 21 U.S.C. § 455(c) by allowing reprocessing of young chickens and turkeys by NPIS establishment personnel without inspector supervision; (3) violation of 21 U.S.C. § 455(b) because each young chicken and turkey carcass will not receive a post-mortem inspection in NPIS establishments; (4) violation of the PPIA's branding requirements; (5) violation of 21 U.S.C. § 455(b) and 9 C.F.R. § 381.1 because each chicken and turkey viscera will not be federally inspected; (6) violation of 21 U.S.C. § 463(c) for failure to provide an opportunity for oral presentation of views; (7) violation of the Administrative Procedure Act ("APA") by failing to provide adequate opportunity for notice and comment; and (8) violation of the APA because the final NPIS rules are arbitrary and capricious. Plaintiffs sought declaratory and injunctive relief. On the same day they filed the complaint, Plaintiffs moved for a preliminary injunction on Claims 1, 2, 6, and 7. The District Court heard the motion on October 17, 2014.

On February 9, 2015, the District Court dismissed the case for lack of subject matter jurisdiction because Plaintiffs lacked standing, and denied the motion for preliminary injunction and all other pending motions as moot. *Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 206 (D.D.C. 2015). With respect to the Individual Plaintiffs, the District Court found that they did not suffer an injury in fact in order to establish standing. *Id.* at 190-95. The District Court also found that FWW lacked standing as an organization, and that Plaintiffs did not suffer a procedural injury sufficient to establish standing.[3] *Id.* at 199-206. Plaintiffs appeal the dismissal on these grounds.

## II.

Before considering the merits of Plaintiffs' standing arguments, we must first determine the appropriate standard under which we should evaluate Plaintiffs' claims. Because Plaintiffs moved for a preliminary injunction, the District Court evaluated Plaintiffs' standing to bring their claims under the heightened standard for evaluating a motion for summary judgment. *See Food & Water Watch*, 79 F. Supp. 3d at 186 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990) (Blackmun, J., dissenting)). This approach was correct for determining whether or not to grant the motion for preliminary injunction, but it was incorrect for determining whether to dismiss the case in its entirety.

---

[3] The District Court also held that the Individual Plaintiffs and FWW lacked informational standing, but Plaintiffs do not appeal those rulings. *See Food & Water Watch*, 79 F. Supp. 3d at 196-99, 203-04.

It is well-established that "each element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). In order to obtain a preliminary injunction, a party must show, among other things, "a substantial likelihood of success on the merits." *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009) (internal quotation marks omitted). "In this context, the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (Williams, J.). In order to establish jurisdiction, a plaintiff must establish standing. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) ("The party invoking federal jurisdiction bears the burden of establishing standing." (citation and internal quotation marks omitted)). Accordingly, a party who seeks a preliminary injunction "must show a 'substantial likelihood' of standing." *Klayman*, 800 F.3d at 568 (Williams, J.). A party who fails to show a "substantial likelihood" of standing is not entitled to a preliminary injunction. *Id.*

However, an inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction, not dismissal of the case. *See id.* at 562 (Brown, J.); *id.* at 568 (Williams, J.). Whether a party's claim requires dismissal because of an inability to establish standing depends on the stage of the litigation. *Bennett*, 520 U.S. at 167-68. Here, Plaintiffs filed their complaint and moved for a preliminary injunction contemporaneously. When the District Court dismissed the case, Defendants had not yet filed an answer, and no discovery had occurred. Accordingly, the

litigation had not proceeded past the pleadings stage, and standing – for evaluating the propriety of proceeding with the case at all – should have been evaluated under the motion to dismiss standard. *Id.* Because what we have before us is the dismissal of Plaintiffs' complaint, we must evaluate whether they have established standing under the standard applicable pursuant to Federal Rule of Civil Procedure 12(b)(1).

To establish standing, Plaintiffs "must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Bennett*, 520 U.S. at 168 (internal quotation marks omitted). However, "we do not assume the truth of legal conclusions, nor do we accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citations and internal quotation marks omitted). Furthermore, "'[w]hen considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties).'" *Id.* at 21 (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989)). In determining standing, we may consider materials outside of the complaint. *See Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

Applying this standard, we review standing *de novo*. *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).

**III.**

Plaintiffs first contend that the Individual Plaintiffs, Sowerwine and Foran, have alleged an injury in fact. Plaintiffs also submit that FWW would have associational standing on behalf of its members. *See, e.g.*, *Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014) (explaining that associational standing requires an organization to show, among other things, that "at least one of [the organization's] members would have standing to sue"). Because the analyses for both the Individual Plaintiffs and FWW's members are identical, *see id.*, we address them jointly here.

For the Individual Plaintiffs or FWW's individual members to establish standing, they must show (i) they have "suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision." *Osborn v. Visa*, 797 F.3d 1057, 1063 (D.C. Cir. 2015) (internal quotation marks omitted). Here, because Plaintiffs are not directly subjected to the regulation they challenge, "standing is 'substantially more difficult to establish.'" *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.* (*Public Citizen I*), 489 F.3d 1279, 1289 (D.C. Cir. 2007) (citing *Defs. of Wildlife*, 504 U.S. at 562). In order to have suffered an injury in fact, Plaintiffs must have suffered an injury that is "(1) concrete, (2) particularized, and (3) actual or imminent." *Id.* at 1292. A concrete injury is "direct, real, and palpable—not abstract." *Id.* A particularized injury is "personal, individual, distinct, and differentiated—not generalized or undifferentiated." *Id.* An actual or imminent injury is "certainly impending and immediate—not remote, speculative, conjectural, or hypothetical." *Id.* at 1293.

Here, Plaintiffs claim their injury in fact is an increased risk of foodborne illness from unwholesome, adulterated poultry resulting from the Defendants' regulation.[4] Increased-risk-of-harm cases implicate the requirement that an injury be actual or imminent because "[w]ere all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury." *Id.* at 1294 (quoting *NRDC v. EPA* (*NRDC II*), 464 F.3d 1, 6 (D.C. Cir. 2006)) (internal quotation marks omitted). Furthermore, "[t]he Supreme Court has repeatedly held that disputes about future events where the possibility of harm to any given individual is remote and speculative are properly left to the policymaking Branches, not the Article III courts." *Id.* at 1295. As a result, this Court has limited its jurisdiction over cases alleging the possibility of increased-risk-of-harm to those where the plaintiff can show "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Id.* at 1295 (emphasis in original); *accord Susan B. Anthony List*, 134 S. Ct. at 2341 ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 n.5, 1150 (2013))). "The word 'substantial' of course poses questions of degree, questions far from fully resolved." *Va. State Corp. Comm'n v. FERC*, 468 F.3d 845, 848 (D.C. Cir. 2006).

---

[4] Because Plaintiffs argue that their increased risk of harm, or alternatively, that the costs associated with avoiding that risk constitute injuries sufficient for standing, we address those injuries separately.

Although Plaintiffs may establish standing by demonstrating an increased risk of harm, "[i]n applying the 'substantial' standard, we are mindful . . . that the constitutional requirement of imminence . . . necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'" *Public Citizen I*, 489 F.3d at 1296. Accordingly, "the proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm – such as death, physical injury, or property damage . . . – as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Id.* at 1298.

The Individual Plaintiffs' and FWW members' alleged harm is the foodborne illness that would result from consuming adulterated, unwholesome chicken produced under the NPIS. In order to have standing, therefore, Plaintiffs at least need to plausibly allege that the NPIS substantially increases the risk of foodborne illness when compared to the existing inspection methods. Accordingly, in order to satisfy this Court's two-part analysis, the Plaintiffs must demonstrate, under the relevant standard, (1) that the NPIS substantially increases the risk of contracting foodborne illness compared to the existing inspection methods, and (2) a substantial probability that the Individual Plaintiffs and FWW members will contract a foodborne illness given that increase of risk. A failure to satisfy either of these prongs would deprive this Court of jurisdiction to hear Plaintiffs' case. *See Public Citizen I*, 489 F.3d at 1295.

14

**A.**

Plaintiffs argue that their complaint and submissions in support of their motion for preliminary injunction sufficiently establish that the NPIS substantially increases the risk of harm that will arise from consuming unwholesome, adulterated poultry. Defendants submit that Plaintiffs have failed to demonstrate a substantially increased risk of harm.

We find that Plaintiffs' complaint, as well as their various submissions in support of their motion for preliminary injunction, fails to plausibly allege that the NPIS taken as a whole substantially increases the risk of foodborne illness as a result of unwholesome, adulterated poultry. First, a careful examination of Plaintiffs' allegations demonstrates that they have not plausibly alleged that the NPIS substantially increases the risk of foodborne illness compared to the existing inspection systems. To be sure, Plaintiffs' submissions contained detailed allegations about how HIMP, and by extension, the NPIS, differs from the existing poultry inspection systems. *See* Compl. ¶¶ 31-77, J.A. 16-25. The complaint is replete with what Plaintiffs argue are the NPIS's inadequacies. *See* Compl. ¶¶ 78-126, J.A. 25-29. The complaint also outlines what Plaintiffs perceive are the flaws with the HIMP studies and analyses. *See* Compl. ¶¶ 148-61, J.A. 33-35. However, these differences and perceived flaws do not demonstrate a substantial increase in the risk of foodborne illness under the NPIS compared to the existing inspection systems.

To the extent that the presence of adulterated, unwholesome poultry could give rise to an inference of resulting foodborne illness, these allegations still fall short because they fail to allege that the NPIS as a whole will

produce significantly more adulterated, unwholesome chicken compared to the existing inspection systems. Plaintiffs' allegations focus on certain discrete aspects of the NPIS: the reduced number of online federal inspectors, the speed at which the online federal inspectors must evaluate carcasses, and the substitution of establishment personnel for federal inspectors. *See* Compl. ¶¶ 78-121, J.A. 25-29. However, Plaintiffs' complaint contains only a single allegation that references another key aspect the NPIS: the reallocation of resources for offline inspection. Compl. ¶ 183, J.A. 39. Under the NPIS, additional offline verification inspectors will check to see to that inspection protocols are being followed and conduct pathogen testing. *See* 77 Fed. Reg. at 4422. Plaintiffs' complaint makes no allegation regarding the impact of increased offline verification inspectors on the presence of adulterated, unwholesome poultry. Although Plaintiffs fault Defendants for failing to account for a reduction in online inspectors in Defendants' risk assessment, Plaintiffs' failure to account for the increase in offline inspections and their attendant impact on poultry production prevents us from inferring that the NPIS as a whole substantially increases the risk of foodborne illness.

Other allegations in the complaint reveal the same problem. For example, the complaint outlines HIMP personnel's alleged failure to catch disease-related conditions on poultry. *See* Compl. ¶ 177, J.A. 38 ("An FWW analysis of the data for 14 HIMP plants found that out of 229 [Noncompliance Reports] filed from March to August 2011, 208 (90 percent) were for visible fecal contamination that was missed by company employees."). Although these allegations, at best, give rise to the inference that establishment personnel will not be as effective in identifying adulterated poultry, they do not allege how NPIS inspection *as a whole* will impact the amount of adulterated poultry.

Notably, these allegations do not allege that these results are *worse* than what plants do under existing inspection systems. Thus, they fail to plausibly allege that the regulations substantially increase the risk of foodborne illness.

Plaintiffs' submissions in support of their motion for preliminary injunction suffer from the same defect. The sworn affidavits from existing USDA inspectors go into great detail about the differences between the NPIS and existing poultry inspection systems. One inspector explained that under the existing inspection systems, they "would have 3 inspectors on each line, with 90 birds per minute split among them, so that each inspector was looking at 30 birds per minute" but under HIMP, one inspector looks "at up to 200 birds, or more, per minute."[5] J.A. 298. Another inspector claimed, "I know I cannot detect all of the carcasses with Food Safety defects, and it is reasonable to assume that some are going out to the public." J.A. 306. A third inspector said, "I know the kinds of unwholesome, mutilated, and diseased chickens that are processed and shipped out for sale and I feel it is important to share this information with consumers and taxpayers" because the HIMP system "is tantamount to having the wolves watch the proverbial henhouse, but these chickens are real and they could very likely hurt or kill someone." J.A. 317. Another inspector who worked previously for a chicken production company and serves currently as a USDA inspector outlined the various pressures that poultry production personnel are under to increase the number of birds that are shipped out to consumers. J.A. 321-24. Although these statements may be alarming, even taken

---

[5] This number is higher than the final rule, which limits the speed for young chickens to 140 birds per minute. 79 Fed. Reg. at 49570, Plaintiffs claim this number remains too high. Compl. ¶¶ 92-99, J.A. 27.

as true, they do not allege that there is a *substantially increased risk* of foodborne illness because they do not allege that the risk of unwholesome, adulterated poultry is higher under the NPIS as a whole than the existing inspection systems.

Plaintiffs could perhaps overcome this deficiency by providing the Court with an alternative basis from which to infer that NPIS inspection results in a substantially increased risk of unwholesome, adulterated poultry. Here, if Plaintiffs could plausibly allege through their use of statistics that NPIS poultry creates a substantial increase in the risk of foodborne illness, they would allege a sufficient injury for standing. We have, in the past, refused to require a quantitative analysis in order to establish standing in increased-risk-of-harm cases, *see NRDC II*, 464 F.3d at 7, and we likewise refuse to hold that statistics are required for such cases. However, we remain mindful that "[d]etermining whether a complaint states a plausible claim [of injury] is context-specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009). Accordingly, where a plaintiff's allegations incorporate statistics and the plaintiff contends that the statistics demonstrate a substantial increase in the risk of harm, the plaintiff must allege something from which the Court can infer that risk. Using our experience and common sense, we cannot make this inference from Plaintiffs' statistics.

A review of Plaintiffs' statistics demonstrates their failure to plausibly allege a substantial increase in the risk of harm. Plaintiffs point to isolated statistics where Defendants found *Salmonella* rates to be "higher" in chicken processed in HIMP establishments than in non-HIMP establishments, but the complaint does not specify how much higher the rates

were. *See* Compl. ¶¶ 162-164, J.A. 35-36. Plaintiffs also submitted selections from an FSIS report that found under some scenarios, "a 0.2% increase in the proportion of samples testing *Campylobacter* positive," but the same page of this report concluded that under most projected scenarios, the samples testing positive for *Salmonella* or *Campylobacter* would decrease. J.A. 430. Plaintiffs also alleged that 0.1% of *Campylobacter* illnesses would be attributable to the NPIS "under some scenarios." Compl. ¶ 180, J.A. 39. Plaintiffs likewise relied on Defendants' risk assessment assumption that annual *Salmonella* and *Campylobacter* illness "attribut[able] to poultry are about 174,686 and 169,005, respectively." J.A. 430. Plaintiffs plucked these statistics from Defendants' studies but provide no allegations from which we can infer that the statistics reflect a substantial increase in the risk of harm. Indeed, Defendants' risk assessment concluded under most scenarios that annual illnesses from *Salmonella* and *Campylobacter* would remain unchanged or would decrease under the NPIS. J.A. 430-31. Even Plaintiffs' complaint acknowledges that the risk of *Campylobacter* increase is "ambiguous." Compl. ¶ 180, J.A. 39. An ambiguous increase in risk is hardly a substantial increase in risk.

Plaintiffs' statistics suffer from additional problems. First, these studies predate the final rule's amendments. Although not necessarily a problem by itself, the rule's amendments specifically lowered the line speeds (one of Plaintiffs' chief criticisms) and made the transition to NPIS inspection voluntary. Plaintiffs make no allegations about the impact of these changes on their statistical claims. Furthermore, Plaintiffs fail to account for how increased allocations in offline inspections would impact the risk. In this context, Plaintiffs' statistics do not plausibly allege that NPIS inspection as a whole substantially increases the risk

that poultry will be contaminated with *Salmonella* or *Campylobacter* compared to the existing inspection systems.[6] Because Plaintiffs have failed to plausibly allege that the NPIS substantially increases the risk of producing unwholesome, adulterated poultry compared to the existing inspection systems, they do not have standing.[7]

---

[6] Our conclusion that Plaintiffs' statistics do not plausibly allege a substantial increase in the risk of harm here does not mean that a plaintiff could never plausibly allege such an increase through the use of statistics culled from government-conducted studies that reach conclusions contrary to the plaintiff's allegations. Rather, it means that, to the extent a plaintiff relies on statistics to show a substantial increase in the risk of harm, a plaintiff cannot allege a bare statistic without plausibly alleging how the statistic reflects a substantial increase in the risk of harm.

[7] Plaintiffs ask us to follow the Second Circuit's approach to increased-risk-of-foodborne illness outlined in *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003). In *Baur*, the Second Circuit held "that exposure to an enhanced risk of disease transmission may qualify as injury-in-fact in consumer food . . . suits." *Id.* at 628. *Baur*'s approach to increased-risk-of-harm cases is not without controversy. *See Va. State Corp.*, 468 F.3d at 848 (noting the conflict among the circuits about what increase in risk must be shown to support standing); *NRDC v. EPA* (*NRDC I*), 440 F.3d 476, 484 (D.C. Cir. 2006), *vacated by rh'g en banc*, *NRDC II*, 464 F.3d 1 (noting the potential "expansiveness" of *Baur*'s reasoning). However, we need not resolve any controversy here. Although *Baur* makes passing reference to "a moderate increase in the risk of disease," *id.* at 637, the Second Circuit's reasoning focused on the probability of the plaintiff suffering harm, *see id.*; *see also NRDC I*, 440 F.3d at 483 (describing *Baur* in the context of increased probability of harm). Because we resolve Plaintiffs' standing on the first prong of the *Public Citizen I* analysis, *Baur* does not impact our analysis here.

**B.**

Plaintiffs also contend that their avoidance of NPIS poultry, or alternatively the increased cost of seeking out poultry from other sources, constitutes an injury in fact to establish standing. Plaintiffs argue that they have taken these steps to avoid potential injury from NPIS-produced poultry. Plaintiffs' complaint alleges that FWW "[m]embers who wish to continue to eat chicken will have to spend additional resources to seek out and purchase poultry from plants that have not adopted NPIS, if this is even possible. FWW members that have lost all confidence in USDA's inspection legend will simply avoid eating chicken altogether." Compl. ¶ 6, J.A. 11-12. Plaintiffs' declarations in support of their motion for a preliminary injunction contain more detailed allegations of avoidance and increased cost, making clear that such costs would be incurred due to their fear of illness from contaminated poultry produced under the NPIS. Jane Foran expressed concern that NPIS poultry may "cause harm to [her] family and [her] health," leading her to "stop eating chicken in restaurants" and to "look for farmers' markets or co-ops." Foran Decl. ¶¶ 11, 13, J.A. 49. Margaret Sowerwine explained that she was "concerned that there will be more contaminated and lower-quality poultry" and that she may "purchas[e] product that could make [her] sick." Sowerwine Decl. ¶¶ 7, 9, J.A. 53-54. As a result, she planned to "find a local farmer" for her poultry purchases, resulting in increased costs or avoiding poultry completely if she cannot afford it. *Id.* ¶ 10, J.A. 54. Wendy Davis feared that she "will be purchasing product that could make [her] or [her] husband sick or even die." Davis Decl. ¶ 8, J.A. 59. Alina Pittman was "concerned that the USDA's NPIS rules will allow for more chicken and turkey that is not safe and unwholesome," which will cause her to "look for farmers' markets" where her

"costs will go up considerably." Davis Decl. ¶¶ 10, 14, J.A. 64, 65. Plaintiffs argue that these avoidance costs are not self-inflicted injuries and are sufficient to establish standing.

In *Clapper*, the Supreme Court explained that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending" because such injuries "are not fairly traceable" to the conduct creating that fear. 133 S. Ct. at 1151. "[O]therwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing by making an expenditure based on a nonparanoid fear." *Id.* As explained in Section III.A, Plaintiffs have not plausibly alleged that they face a substantial increase in the risk of harm from NPIS-produced poultry. Just as the respondents in *Clapper* could not repackage their "first failed theory of standing" as a theory of costs, *id.*, Plaintiffs here cannot establish standing by incurring costs that "are simply the product of their fear of" NPIS poultry, *id.* at 1152. Accordingly, Plaintiffs' "self-inflicted injuries are not fairly traceable" to the NPIS, "and their subjective fear . . . does not give rise to standing." *Id.* at 1152-53.

## IV.

FWW argues that it has standing to pursue its claims on its own behalf. FWW may assert standing on its own behalf, but organizational standing requires FWW, "like an individual plaintiff, to show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Equal Rights Ctr.*, 633 F.3d at 1138 (internal quotation marks omitted). An organization must allege more than a frustration of its purpose because frustration of an organization's objectives "is the type of abstract concern that does not impart standing." *Nat'l*

*Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995). "The court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006). Accordingly, for FWW to establish standing in its own right, it must have "suffered a concrete and demonstrable injury to [its] activities." *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (internal quotation marks omitted). Making this determination is a two-part inquiry – "we ask, first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *Id.* at 1094 (internal quotation marks omitted). We need not address the second prong of this inquiry because it is clear that FWW has not sufficiently alleged an injury to its interest.

To allege an injury to its interest, "an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services in order to establish injury in fact." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (internal quotation marks omitted). An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an "inhibition of [the organization's] daily operations." *PETA*, 797 F.3d at 1094 (quoting *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986)). Our precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury. *Id.* at 1093-94; *Turlock Irrigation Dist.*, 786 F.3d at 24. Furthermore, an organization does not suffer an injury in fact where it "expend[s] resources to educate its

members and others" unless doing so subjects the organization to "operational costs beyond those normally expended." *Nat'l Taxpayers Union, Inc.*, 68 F.3d at 1434; *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (organization's expenditures must be for "'operational costs beyond those normally expended' to carry out its advocacy mission" (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434)).

According to Patricia Lovera, the Assistant Director of FWW, one of FWW's "primary purposes is to educate the public about food systems that guarantee safe, wholesome food produced in a sustainable manner." Lovera Decl. ¶ 4,[8] J.A. 68. As a result, FWW is concerned that NPIS will allow inadequately trained staff to inspect food and that food safety will suffer because inspection will be turned over to poultry establishment personnel. *Id.* ¶¶ 8-9, 21, J.A. 69-70, 72-73. Lovera contends that allowing the NPIS to go into effect will cause "all of the organization's time and resources spent advocating against NPIS [to have been] wasted." *Id.* ¶ 10, J.A. 70. Lovera also claims that "FWW would have to increase the resources that it spends on educating the general public and its members that the NPIS rules do not allow for the inspection of poultry product prescribed by the PPIA." *Id.* ¶ 11, J.A. 70. Additionally, "FWW will spend time and money on increasing its efforts to educate members of the public that just because a poultry product has a USDA inspection legend does not mean that it is not adulterated and is wholesome." *Id.* ¶ 12, J.A. 70-71. Finally, Lovera states that "FWW will increase the amount of resources that it spends encouraging its members who wish to continue to eat chicken to avoid poultry from such companies" and "to

---

[8] The declaration erroneously contains two paragraphs numbered as "4." This citation refers to the second of those paragraphs.

purchase poultry at farmers' markets or direct from producers." *Id.* ¶ 13, J.A. 71.

Lovera's statements make clear that FWW has alleged no more than an abstract injury to its interests. Our recent decision in *PETA* is instructive. In *PETA*, an animal-welfare organization challenged the USDA's failure to apply statutory general animal welfare requirements to birds. 797 F.3d at 1089-91. Ordinarily, when the USDA applied the animal welfare requirements, an outside organization like PETA could seek redress for mistreatment by filing a complaint with the USDA. Because the USDA refused to apply those requirements to birds, PETA could not seek redress for mistreatment of birds through the USDA's complaint procedures. *Id.* at 1091. Additionally, because the USDA was not applying the requirements to birds, the USDA was not generating inspection reports that the organization used to educate its members. *Id.* The agency inaction injured the organization because the organization suffered a "denial of access to bird-related . . . information including, in particular, investigatory information, and a means by which to seek redress for bird abuse" *Id.* at 1095. We found these injuries to be "concrete and specific to the work" in which the organization was engaged. *Id.* (quoting *Action All.*, 789 F.2d at 938). The denial of access to an avenue for redress and denial of information "perceptibly impaired [the organization's] ability to both bring [statutory] violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public." *Id.* (internal quotation marks omitted).

In the present case, taking all of FWW's allegations and Lovera's statements as true, FWW has alleged nothing more than an abstract injury to its interests that is insufficient to support standing. FWW does not allege that the NPIS limits

its ability to seek redress for a violation of law. Nor does FWW allege that the USDA's action restricts the flow of information that FWW uses to educate its members. Although Lovera alleges that FWW will spend resources educating its members and the public about the NPIS and USDA inspection legend, nothing in Lovera's declaration indicates that FWW's organizational activities have been perceptibly impaired in any way.[9] Accordingly, FWW has not alleged an injury to its interest to give rise to organizational standing.

## V.

Plaintiffs' final standing argument on the basis of procedural injury is easily resolved. Plaintiffs claim that they have suffered a procedural injury sufficient to establish standing because Defendants violated their procedural rights.

---

[9] The concurrence contends that FWW has met the first prong of the organizational standing analysis because, taking FWW's allegations as true, the complaint has alleged a "direct conflict" between the NPIS and FWW's mission. Conc. Op. at 6 n.5 (Henderson, J.). However, even if FWW were to allege a "direct conflict," an issue on which we express no opinion, FWW would still need to allege an injury to its interest. "[I]n those cases where an organization alleges that a defendant's conduct has made the organization's *activities* more difficult, the presence of a direct conflict between the defendant's conduct and the organization's *mission* is necessary – though not alone sufficient – to establish standing." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996); *see also Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) ("If the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission, we have found it 'entirely speculative' whether the challenged practice will actually impair the organization's activities." (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1430)).

However, "the omission of a procedural requirement does not, by itself, give a party standing to sue." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009). "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). As explained in the foregoing, Plaintiffs have failed to establish that they will suffer any cognizable injury. Because Plaintiffs "have failed to establish that they will likely suffer a substantive injury, their claimed procedural injury . . . necessarily fails." *Sierra Club v. EPA*, 754 F.3d 995, 1002 (D.C. Cir. 2014).

## VI.

For the foregoing reasons, we hold that Plaintiffs have failed to show any cognizable injury sufficient to establish standing. Accordingly, we affirm the District Court.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in the judgment: Although I agree with my colleagues that the individual and organizational plaintiffs do not have standing, I so conclude for a different reason. Regarding the two individual plaintiffs, I believe we need not assess whether they face a "*substantially* increased risk of harm and . . . *substantial* probability of harm" from consuming NPIS-inspected poultry (NPIS poultry), *see Public Citizen v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007) (emphases in original), because, as their declarations make clear, they have the alternative of consuming non-NPIS poultry—*e.g.*, by purchasing poultry from a farmers' market—and they have failed to allege that the alternative is "*not readily available at a reasonable price*." *See Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1281 (D.C. Cir. 2012) (emphasis in original). For this reason, any injury they suffer from consuming NPIS poultry is a self-inflicted injury that would not establish Article III standing. Regarding plaintiff Food & Water Watch (FWW), I would reject its organizational standing argument because its only expenditures are made for "pure issue-advocacy," an insufficient injury to support standing under our precedent. *See Ctr. for Law & Educ. v. Dep't of Educ.,* 396 F.3d 1152, 1162 (D.C. Cir. 2005).

The individual plaintiffs allege that they cannot determine whether the poultry they buy at grocery stores is NPIS-inspected and, at the same time, that NPIS poultry accounts for 99.9% of available poultry. *See* Compl. ¶ 34. If the plaintiffs were in fact limited to purchasing poultry at grocery stores, I too would most likely conduct the "substantial increase and substantial probability" inquiry my colleagues undertake. *See* Maj. Op. 13–18. But that is not the case. Under our precedent, if a plaintiff has access to an alternative of the product he claims causes his injury, he must show that the alternative is either (1) "not readily available" or (2) not "reasonabl[y] price[d]" to establish standing.

*Public Citizen v. Foreman*, 631 F.2d 969, 974 n.12 (D.C. Cir. 1980). And because the plaintiffs assert only that they "seek out chicken from [both] *local farmers' market*[s] [and] *grocer*[*s*]," Foran Decl. ¶ 3, J.A. 47 (emphasis added), they have failed to do so.[1] To rule out access to an alternative under the first prong, the alternative must be "difficult to obtain." *See Coal. for Mercury-Free Drugs*, 671 F.3d at 1281 (emphasis omitted). It is not enough, for example, to allege that *some,* or even many, suppliers do not provide it. *See id.* at 1282. Under the second prong, the plaintiffs must allege more than "the mere existence of a price differential," *id.*; instead, they must claim that the product is not reasonably priced. *See id.* at 1282–83. Notwithstanding neither assertion is "overly burdensome," *Foreman*, 631 F.2d at 974 n.12; *see Coal. for Mercury-Free Drugs*, 671 F.3d at 1281, 1283 (price differential must have more than "little effect" on alternative's "affordability for the average person"), the plaintiffs' failure to *affirmatively* allege unavailability or unreasonable cost should end our inquiry. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[t]he party invoking federal jurisdiction bears the burden of establishing" standing).

Granted, the two individual plaintiffs' declarations are vague about the cost and accessibility of farmers' markets but they are plainly insufficient to sustain their standing in my view. *See* Foran Decl. ¶ 6, J.A. 48 (plaintiff unable to find farmers' market near family residences); *see also* Sowerwine Decl, *supra* n.1; *cf.* FWW member Pittman Decl. ¶ 10, J.A. 64

---

[1] *See also* Sowerwine Decl. ¶ 10, J.A. 54 ("If the USDA's rules go into effect . . . I will have to find a local farmer from whom I trust to purchase chicken and turkey."); *cf.* FWW Member Pittman Decl. ¶ 10, J.A. 64 ("If the USDA's rules go into effect . . . . I would have to look for farmers' markets"). Critically, the plaintiffs allege that poultry sold at farmers' markets *is* "slaughtered in sanitary conditions." *See e.g.,* Foran Decl. ¶ 3, J.A. 48.

("turkey is not always available year –round" [sic] at preferred farmers' market). But the plaintiffs allege no facts supporting the notion that poultry from farmers' markets is either unavailable or unreasonably priced.[2] At best, their allegations are agnostic about the proximity, inventory and pricing of nearby markets, which is, to me, insufficient to conclude that non-NPIS poultry is either "difficult to obtain" or that the price differential is sufficient to affect "affordability for the average person." *Coal. for Mercury-Free Drugs,* 671 F.3d at 1281, 1283 (emphasis omitted).

The individual plaintiffs have two options. They can either purchase/consume the source of their alleged injury (*i.e.*, NPIS poultry) or they can avoid it. Avoidance then presents two possibilities. They can stay away from poultry altogether or they can purchase/consume non-NPIS poultry. In *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013), the Supreme Court concluded that the respondents' alleged injury—likelihood that their telephone and email communications would be intercepted by domestic surveillance—was, for many reasons, too speculative to support standing, *id.* at 1147–50. It then rejected the respondents' argument that the costs they incurred to *avoid*

---

[2] FWW member Pittman alleges that "costs will go up considerably" at farmers' markets, where "ground turkey alone is $12 per pound." Pittman Decl. ¶ 10, J.A. 64. I find her assertion inadequate for two reasons. First, she does not mention the price of ground turkey at her grocery store (presumably selling NPIS turkey). Second, assuming that her reference to "turkey bacon and deli meat" costing "$9 per pound" at her grocery store, *id.* ¶ 3, J.A. 62, results in a $3 per pound price increase in *ground* turkey at farmers' markets, I cannot conclude that this threadbare price differential recital suffices to establish that "affordability for the average person" is affected. *Coal. for Mercury-Free Drugs*, 671 F.3d at 1283.

surveillance were themselves a cognizable injury, concluding that "allowing respondents to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of respondents' first failed theory of standing." *Id.* at 1151. *Clapper* subsequently dubbed the respondents' "avoidance" injury "self-inflicted." *Id.* at 1152. I take from this holding that injury attendant on the avoidance of an uncognizable injury is itself insufficient for standing because, for one thing, it is self-imposed. Here, the individual plaintiffs' professed injury from eschewing poultry altogether is similarly self-imposed— and therefore insufficient for standing—because they are free to purchase/consume poultry that is neither "difficult to obtain" nor "unreasonably priced." *Coal. for Mercury-Free Drugs*, 671 F.3d at 1281, 1283 (emphasis omitted).[3]

I believe this case is on all fours with *Coalition for Mercury-Free Drugs*. There, the plaintiffs challenged the Food and Drug Administration's (FDA) approval of the use of thimerosal, a mercury-based preservative, in certain vaccines. *Coal. for Mercury-Free Drugs*, 671 F.3d at 1276–77. The plaintiffs alleged a "fear of *future* exposure to mercury," claiming that it could cause "miscarriages, autism, and other developmental disorders." *Id.* at 1278, 1280 (emphasis in

---

[3] Granted, *Clapper* was decided at the summary judgment stage, 133 S. Ct. at 1146, and here we review dismissal. *Food & Water Watch v. Vilsack*, 79 F.Supp.3d 174, 179 (D.D.C. 2015); Maj. Op. 8–10. Although the showing necessary to establish standing varies at each stage of the litigation, *see Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006), nonetheless we can plainly uphold dismissal of claims for lack of standing, including lack of standing based on self-inflicted injury. *See e.g., Fair Emp't Council of Greater Washington, Inc., v. BMC Marketing Corp.*, 28 F.3d 1268, 1271, 1276 (D.C. Cir. 1994).

original). But the plaintiffs did not allege that thimerosal-*free* vaccines were not readily available at a reasonable price. *Id.* at 1282. "On the contrary," we recognized, "they sa[id] that they w[ould] refuse thimerosal-preserved vaccines." *Id.* at 1280. Given the existence of a readily available and reasonably priced thimerosal-free alternative—the plaintiffs' "declarations [having] claim[ed] only that there was *some* price differential at a few individual outlets," *id.* at 1283 (emphasis added)—any injury from exposure to thimerosal-based vaccines would be self-inflicted. And, accordingly, we concluded that the plaintiffs lacked standing. *See id.*[4]

Regarding plaintiff FWW, our organizational standing jurisprudence applies a two-part test to determine whether an organization has alleged a cognizable injury. *See Equal*

---

[4] *Foreman*, on the other hand, is inapposite. There, the plaintiffs challenged the FDA's approval of the use of nitrites, whose probable carcinogenic effect was undisputed, as a bacon preservative. 631 F.2d. at 973–74. Because the plaintiffs alleged that bacon preserved *without* nitrites was "*not* readily available at a reasonable price," *id.* at 974 n.12 (emphasis added), we concluded the plaintiffs had standing.

*Baur v. Veneman* is similarly distinguishable. 352 F.3d 625 (2d Cir. 2003). There the plaintiffs challenged the United States Department of Agriculture's (USDA) failure to "ban the use of downed livestock as food for human consumption." *Id.* at 628. The court did not discuss whether the plaintiffs had any way to obtain meat that did not come from downed livestock. Here, however, the plaintiffs posit that poultry from farmers' markets does not expose them to the injury allegedly resulting from NPIS poultry. *See* Foran Decl. ¶ 3, J.A. 48. Although *Baur* did not discuss the absence of alternative, and allegedly safe, meat suppliers, the Second Circuit approvingly cited *Foreman* for the proposition that, if an alternative is available, a plaintiff must allege that it is "not readily available at a reasonable price." *Id.* at 634.

*Rights Ctr. v. Post Props., Inc.,* 633 F.3d 1136 (D.C. Cir. 2011). Litigation brought by an organization against a government entity requires that we ask, first, whether the agency's action or omission to act "injured the [organization's] interest and, second, whether the [organization] used its resources to counteract that harm."[5]

---

[5] In my view, the first prong requires only a "direct conflict" with the plaintiff organization's mission. *Am. Soc'y. for Prevention of Cruelty to Animals v. Feld Entm't*, 659 F.3d 13, 25 (D.C. Cir. 2011) ("First, an organization seeking to establish [organizational] standing must show a direct conflict between the defendant's conduct and the organization's mission." (quotations omitted)); *See also PETA v. USDA*, 797 F.3d 1087, 1095 (D.C. Cir. 2015) ("[W]e have emphasized the need for a direct conflict between the defendant's conduct and the organization's mission." (quotations omitted)); *Abigail Alliance*, 469 F.3d at 133 ("[T]here must . . . be a direct conflict between the defendant's conduct and the organization's mission."). Unlike my colleagues, I believe FWW satisfies this prong. Its mission includes "maintaining strong federal inspection of poultry" and "work[ing] to promote the practices and policies that will result in sustainable and secure food systems." Lovera Decl. ¶ 4, J.A. 68 (reference to paragraph 4 is to second of paragraphs numbered "4"). And FWW alleges that the NPIS "threaten[s] public health and introduc[es] unwholesome poultry into interstate commerce." Compl. ¶ 1, J.A. 9. Of course, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). It is only because FWW's resources are spent on "pure issue-advocacy," as explained *infra*, that its standing is lacking. My colleagues, I believe, have erroneously injected a prong-two consideration—*i.e.*, what FWW has spent its money to combat—into the prong-one inquiry whether the NPIS "directly conflicts" with FWW's mission. They distinguish *PETA* under prong one by simply highlighting the agency's omissions. Maj. Op. 24. In stopping at that point, they do not complete the prong-one analysis, that is, whether or not what the agency does—or, as in

*Id.* at 1140 (quotation marks omitted). Under the second prong, we have held that expenditures for "pure issue-advocacy" are insufficient for standing. *See Ctr. for Law & Educ.*, 396 F.3d at 1162 (D.C. Cir. 2005) ("Here, the only 'service' impaired is pure issue-advocacy . . . . In sum, Appellants fail to demonstrate standing . . . ."); *cf. Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) ("[A] mere 'interest in a problem' . . . is not sufficient by itself to render the organization 'adversely affected' . . . . [I]f a 'special interest' in [a] subject were enough to entitle the [plaintiff] to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization . . . ."). In other words, an organization's "expend[iture of] resources to educate its members and others regarding" government action or inaction "does not present an injury in fact." *See e.g., Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (non-profit taxpayer organization *qua* organization had no standing where its only expenditures to contest federal estate and gift tax rates were made to educate public and challenge legislation); *Ctr. for Law & Educ.*, 396 F.3d at 1161–62 (organization lacked standing where alleged unlawful government action increased lobbying costs only). Instead, an organizational plaintiff must "allege impairment of its ability to provide services, [not] only impairment of its advocacy." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015). FWW's sole allegation that it has made expenditures based on the challenged NPIS regime is tied to

---

*PETA*, fails to do—is in direct conflict with the organization's mission.

On the other hand, an organization can—and here, does—show the necessary direct conflict but nonetheless expend resources on matters we have said do not support standing, *e.g.*, issue advocacy. Otherwise, our two-pronged inquiry merges into one prong.

educating its members and the public.[6]  In essence, FWW seeks to sound an alarm regarding the dangers of NPIS poultry.  This is "pure issue-advocacy."  *Ctr. for Law & Educ.*, 396 F.3d at 1162.

Moreover, I believe our decision in *PETA* is distinguishable.  There, PETA made expenditures to fill a void left by the USDA when, according to PETA, the USDA unlawfully failed to apply the protections of the Animal Welfare Act, 7 U.S.C. §§ 2131 *et seq.*, to birds.  *Id.* at 1091.  Its failure "meant, *ipso facto*, that the USDA was not creating bird-related inspection reports that PETA could use to raise public awareness."  *Id.*  Thus, PETA was "required to expend resources to obtain information about the conditions of birds . . . , including through investigations, research and state and local public records requests."  *Id.* at 1096.  PETA suffered a cognizable injury-in-fact because it spent resources to remedy alleged governmental nonfeasance, which deprived PETA of information to which it was allegedly entitled.  But for the USDA's failure to act, "PETA would not need to undertake" those efforts, *id.*, and, on that basis, we concluded that PETA's expenditures constituted a cognizable injury.  *Id.* at 1097.

Granted, we have found organizational standing in *private-party* litigation on the basis of expenditures made to

---

[6] *See* Lovera Decl. ¶ 11–13, J.A. 70–71 (explaining that FWW plans to "educat[e] the general public and its members that the NPIS rules do not allow for the inspection of poultry product prescribed by the [Poultry Products Inspection Act]," "educate members of the public that just because a poultry product has a USDA inspection legend does not mean that it is not adulterated" and "increase the amount of resources that it spends encouraging its members who wish to continue to eat chicken to avoid poultry from such companies").

educate the public. For example, in *Spann v. Colonial Village, Inc.*, the Fair Housing Council of Greater Washington and the Metropolitan Washington Planning & Housing Association challenged allegedly racially-motivated real estate advertisements placed by realtors and advertisers, claiming the ads violated the Fair Housing Act of 1968. 899 F.2d 24, 25–26 (D.C. Cir. 1990). We held that the organizations had standing because they spent funds on "endeavors designed to educate . . . black home buyers and renters [and] the D.C. area real estate industry and the public that racial preference in housing is indeed illegal." *Id.* at 27. But *Spann* also made clear that our circuit has drawn a bright-line between private-party suits and "suits against the government to compel the state to take, or desist from taking, certain action." *Id.* at 30. The latter "implicate most acutely the separation of powers, which, the Supreme Court instructs, is the 'single basic idea' on which the Article III standing requirement is built." *Id.* The former, by contrast, are "traditional grist for the judicial mill." *Id*. Thus, if an organization's standing to pursue litigation against the government is premised only on injury flowing from expenditures to educate the public, the suit amounts to no more than an "assert[ion] [of] generalized grievances about the conduct of Government," *id.* at 27 (quotation marks omitted), and organizational standing is lacking.

For the foregoing reasons, I concur in the judgment.

MILLETT, *Circuit Judge*, concurring: I join Judge Wilkins' opinion for the Court in full. I write separately only to reiterate my continuing concerns about this Court's organizational-standing doctrine and the unwarranted disparity it seems to have spawned between individuals' and organizations' ability to bring suit. *See People for the Ethical Treatment of Animals v. United States Dep't of Agriculture*, 797 F.3d 1087, 1099–1106 (D.C. Cir. 2015) (Millett, J., dubitante). Because the majority opinion properly applies our precedent to keep a bad jurisprudential situation from getting worse, I concur. But I continue to believe that our organizational standing doctrine should be revisited in an appropriate case.